McKlNNEY, J.,
delivered the opinion of the Court.
This was an action on the case, to recover the value of a slave, the property of Allen, alleged to hare been wrongfully converted by Jones. Verdict and judgment were for the plaintiff, for $1050.00.
The following are the material facts: In the fall of 1857, Jones had a. corn-husking. He invited his neighbors to assist him, and sent a message to Allen, requesting him to send help. About twenty five white men, and seventy-five negroes assembled, after dark; and among other negroes, was Isaac, the property of Allen. About ten or eleven o’clock in the night, the slaves were called to supper, and after supper, they were directed by Jones to go home. -Most of them left, but some, *633 (and Isaac among the number,) remained in the back .yard some half an hour, amusing themselves wrestling. While thus engaged, a white man, whose name is Hager, approached Isaac, and without any provocation, as it seems from the record, stabbed him mortally, and he died in a few minutes after. Jones- had retired into the house, after' directing the slaves to go home, and knew nothing of the occurrence until after it was over. It seems that the messenger by whom Jones sent the request to Allen for help, did not deliver the message, but Jones was not informed of his neglect to do so, until sometime' after the murder of the slave. There is no direct evidence that the slave Isaac went to the corn-husking, by the permission, or with the knowledge of his master. The proof shows, that Jones knew that Isaac was present, and engaged in husking corn with the other slaves; and it is not shown that he objected to his being there, or made any inquiry as to whether his master had given him permission to attend. It is also shown, that Jones handed around spiritous liquor to the hands while at work, and gave it to Isaac as well as to the other slaves; but there is no intimation that Isaac, or any one else, was intoxicated, except Hager, who came there drunk, and without being invited.
The declaration contains two counts. The first is in trover, for an unlawful conversion of the slave; and the second is a special count in case. The gravamen of the latter count is, that Jones knowingly and unlawfully suffered the slave, without a written permit, or consent from his master, to go upon his premises with other slaves; and being so there, employed said slave in husk *634 ing corn; and while thus employed upon the defendant’s .premises, said slave was killed, and lost to the plaintiff.
The verdict was upon the count in trover. The Court charged the jury, in substance, that, by law, the defendant was bound at his peril, to know whether the slave was present at the corn-husking by the authority and with the consent of his owner. And if there without such authority and consent, although the defendant may have believed that he was present in pursuance of the message sent, and supposed to have been delivered to his master, the defendant assumed to exercise any authority over him inconsistent with the dominion of his owner, either by putting him to service in husking corn, or with knowledge that he was voluntarily so engaged, in sanctioning his -employment, and in receiving and appropriating his labor to his own use, that then the plaintiff might elect to treat such assumed authority as a conversion of the slave, and sue in trover for his value. That the gist of the action was not the killing of the slave by Hager, but the wrongful conversion of him by the defendant.
The Court excluded evidence of the usage of the country, of slaveholders sending their slaves on such occasions to help their neighbors, on request, without any written evidence of permission or consent.
Two questions arise upon this record: 1st. Whether, under the circumstances, the law affords any remedy to the plaintiff, against the defendant; and if so, what the appropriate remedy is; whether trover, or a special action on the case. The inquiry is important, not merely as a question of pleading, with a view to preserve the proper distinction between the different forms of action; *635 its chief importance in the present instance, is in view of the question of damages. In trover, the rule of damages is arbitrary; tbe measure, in general, is the value of the property tortiously converted. But, in case, which is an action “founded on the plaintiff’s title in Justice and equity to receive a compensation in damages.” 2 Stark. Ev., 212, the damages are to he estimated by the jury, in view of all the circumstances of the particular case; and under the general issue, the defendant may give in evidence any facts or circumstances which, in equity, are sufficient to bar the plaintiff’s claim. Id.
The argument for the plaintiff assumes, that the plaintiff was guilty of a violation of positive law, in suffering the slave to remain upon his premises without the master’.s written permission or consent, and the charge of the 'Court seems to sanction this position. The act of 1803, ch. 13, sec. 3, declares, that “no person or persons, shall knowingly permit any slave or slaves to come, collect, or assemble, at his or their dwelling-house, negro-house or houses, without a written pass from the owner, overseer, or person in whose employ such slave or slaves may be, setting forth his or their business, and time of absence, &c., under the penalty of ten dollars. The act of 1831, ch. 103, sec. 1, forbids “ All assemblages of slaves, in unusual numbers, or at suspicious times and. places, not expressly authorized by the ownersand requires that all such assemblages shall be dispersed by any patrol, of the bounds, or constable or justice of the peace. And by .the second section, “Any person or persons, who shall knowingly permit any such assembly to be held on his *636 or her land or premises,” shall be liable to indictment, &c.
By a subsequent statute, every master or overseer is constituted a patrol for his own premises.
The object of these provisions is obvious enough. For reasons of policy and necessity, it has been found indispensable, in every slave-holding community, to provide various police and patrol regulations, giving to white persons, other than the owner, the right, and making it the duty, under certain circumstances, to exercise a control over slaves. The safety of the community, the protection of the person and property of individuals, and the safety of the owner’s property in his slaves, alike demand the enactment of such laws. But these statutory provisions must be understood and expounded, according to the manifest intention of the Legislature. We are not to forget, nor are we to suppose that it was lost sight of by the^ Legislature, that, under our modified system of slavery, slaves are not mere chattels, but are regarded in the two-fold character of persons and property. That as persons,, they are considered by our law, as accountable moral agents, possessed of the power of volition and locomotion. That certain rights have been conferred upon them by positive law and judicial determination, and other privileges and indulgences have been conceded to them by the universal consent of their owners. By uniform and universal usage, they are constituted the agents of their owners, and are sent on their business, without written authority. And in like manner, they are sent to perform those neighborly good offices, common in every community. They are not, at all times, in the service of their owners, and are allowed, by *637 universal sufferance, at night, on Sundays, holidays, and other occasions, to go abroad, to attend church, to visit those to whom they are related by nature, though the relation be not recognized by municipal law; and to exercise other innocent enjoyments, without its ever entering the mind of any good citizen, to demand written authority of them. The simple truth is, such indulgences have been so long, and so uniformly tolerated, that public sentiment upon the subject has acquired almost the force of positive law. Would it not be absurd to suppose, that the police regulations above noticed, -had reference to such usages?
But, to give to the argument the utmost scope to which it can be entitled, let it be conceded, that the defendant, in suffering the slave to come, or remain upon his premises, without a “written pass” from the master, was guilty of a violation of the act of 1803; what can be predicated of it ? Nothing .more than that he incurred the pecuniary ' penalty prescribed for such violation. And it may be admitted, that, in a suit to recover the penalty, .the defendant could not have successfully defended himself on the ground, that the owner had, in fact, .given the slave .parol license, or consent, to attend the corn-husking. We have held, that on an indictment for .trading with a slave, without a written permit from the master, it cannot be set up as a de-fence, that the master, in point of fact, knew of, and consented to -the trading with his slave in the given case; and for the simple reason, that, by the express terms of the statute on which the indictment was framed, the evidence of the master’s consent is required to be in writing. But, we likewise held, that in a common law *638 action to regain the property received from the slave, or to recover its value, the master might he repelled, by showing, that in fact he did verbally consent to the traffic with his slave.
The principle, we think, is alike applicable to the present case. And such verbal consent may, as in other cases, be established either by direct evidence, or be implied from circumstances.
The effect of this principle, applied to the case under consideration, is, that the want of a “written pass,” would he of no consequence, provided there were sufficient evidence to show the master’s verbal consent, that the slave should attend the corn-husking.
But, supposing that no consent of the master was given, in any form, and that the slave merely of his own volition, went upon the defendant’s premises, and engaged in husking corn, and that the defendant, knowing that he was there without authority, passively acquiesced in his remaining, and in his continuing to assist in husking corn; would this amount to a conversion ? Clearly not, in our opinion. To constitute a conversion, “ there must be a positive tortious act.” A mere non-feasance, or neglet of some- legal duty, will not suffice to support trover, although it may constitute sufficient ground to maintain an action on the case. Bromley v. Coxwell, Bos. and Pull., 438; Ross v. Johnson, 5 Bur., 2825; 2 Starkie’s Ev., 840. The tacit consent of the defendant, to receive the service of the slave, might, for some purposes, be equivalent to a previous command. It would undoubtedly be so, in a suit brought to recover the value of the slave’s services. But it cannot be held to amount to a conversion.
*639 This doctrine of constructive conversion, as applied to slaves, must be carefully guarded, or its operation will be extremely mischievous.
The only affirmative acts, so to speak, imputed to the defendant, furnishing the slave with supper and a dram, are entitled to no consideration in the determination of the point of conversion.
It is certainly true, that if one furnishes liquor to a slave, he may be held amenable for a violation of the statute; and it is likewise true, that if the slave should thereby become intoxicated, and, as an immediate consequence of this drunkenness, should suffer injury, such person would be answerable to the master, but not as for a conversion.
It is not assumed that the defendant is liable in damages for the killing of the slave. The charge of the Court negatives his liability on that ground, and we think properly. For the killing of the slave cannot be regarded as the natural and proximate consequence of the omission of duty imputed to the defendant.
The result of our opinion is, that trover will not lie upon the facts in this record; and in instructing the jury otherwise, the Court erred. The remedy is case, if there be any.
Judgment reversed.